Herman vs. The City of Oconto.

Herman, Respondent, vs. The City of Oconto, Appellant.

*February 1 — June 20, 1901.*

*Municipal corporations: Sewer contracts: Pleadings: Evidence: Bribery: Constitutional law: Limitation on indebtedness: Assets: Liabilities: Tax levies: " Current expenses:" " Outstanding obligations:" Contracts: Severance: Scaling down.*

1. In an action to recover under a sewer contract the answer alleged that the contract was secured by means of fraud, bribery, and corruption. On a former appeal this allegation was held sufficiently definite to permit the introduction of evidence on such issue. The work was completed by the plaintiff, surety for the original contractor, after the latter had abandoned it, and the city received and retained the sewers, which cost considerable more than the contract price. The evidence showed that a lawyer, employed by the original contractor, bought refreshments for the members of the board of public works, and was active in assisting the contractor to secure the contract, but there was no evidence as to when the city discovered the alleged bribery, nor was plaintiff's good faith challenged. The evidence also showed that but two bids were received, that of plaintiff's principal being slightly the higher; that before awarding the contract the board satisfied themselves that the other bidder was not a desirable person; and that, acting on such information, the contract was awarded to plaintiff's principal as the lowest responsible bidder. The court submitted to the jury a special question, in substance, whether at or about the time the sewer contract was let the contractor or his agent paid any money to any member of the board of public works for the purpose of

corruptly influencing official action, which the jury answered in the negative. *Held,* that the evidence did not sustain the charge of bribery; that the verdict was within the allegations of the answer; and that the circumstances disclosed by the evidence were not so flagrant that the court should have gone beyond the direct issues made by the pleadings in submitting the case to the jury.

2. A city borrowed $35.000 from the state with which to erect a high-school building, and at the time of letting a contract for the construction of a sewer about $21,000 thereof was in the treasury, and the building was in process of erection. There was no proof that any contract had been let for the school building or as to its probable cost. *Held,* that the unexpended balance should not be considered as an asset in determining whether the obligations under said sewer contract were in excess of the constitutional limit of indebtedness, the presumption being that it was needed and to be used for the purpose for which it was borrowed.

3. Where a contract for the construction of sewers was made in October, taxes which had been apportioned by the secretary of state under sec. 1070, Stats. 1898, to pay amounts due the state January 1st, following, but which could not go into the tax collector's hands for collection until December, cannot be considered "in process of immediate collection" so as to make them assets of a city in determining whether the constitutional limit of indebtedness had been exceeded.

4. Where the exact amount of indebtedness under the contract in such a case cannot be ascertained from the record, it will be assumed, in determining whether the city's indebtedness, including such contract, exceeded the constitutional limit, that the actual amount of indebtedness on such contract is the amount admitted by the city to have been earned by the contractor, independent of any deduction therefrom of damages allowed the city for failure to complete the contract within the time limited therefor.

5. Contracts whereby a city had agreed to pay certain sums annually for its water supply for thirty years; certain sums monthly for electric lights for three years; and certain sums monthly for teachers' wages,— upon which nothing was due when a contract for the construction of a sewer was entered into,— cannot be included as liabilities in determining whether, by the sewer contract, the city had exceeded the constitutional limit of indebtedness. *Stedman v. Berlin,* 97 Wis. 505, approved.

6. Interest on outstanding bonds of a city payable in annual instalments in the future is not a present indebtedness within the meaning of such limitation.

7. Debts for the ordinary running expenses of a city, and debts within the power of a city to contract, payable within a year out of the incoming revenues actually levied or in good faith intended to be levied, are not such as are comprehended within the last clause of sec. 3, art. XI, Const., requiring any city, before or at the time of incurring any indebtedness, to provide for the collection of a direct annual tax sufficient to pay the interest as it falls due, and the principal within twenty years. If, however, the debt is made to mature at such time as would make it a charge upon the future resources of the city beyond one year, then the levy of such tax is necessary to its validity.

8. Where the city charter gave the common council power to build sewers and pay the expense out of the general fund, a sewer contract, bearing no interest, payable within one year,— the city, at the time of entering into such contract, having no funds on hand with which to pay the contract price,— is not void under said sec. 3, art. XI, Const., because no provision was made at the time it was executed for the collection of a direct tax.

9. The building of a sewer is not "a current expense" within the meaning of sec. 2, subch. V, ch. 56, Laws of 1882 (authorizing the city to annually levy a tax not exceeding one half of one per cent. to defray current expenses, and a like amount for all other purposes except payment of any outstanding obligations, etc.), but the contract being such as the city had power to make and provide for its payment out of the general fund, the debt incurred therefor is an "outstanding obligation" within the meaning of such exception. [Whether said provisions of the charter are such a limitation on the power to contract as would render a contract in excess thereof void, not decided.]

10. Under said charter (sec. 17, subch. VI, ch. 56, Laws of 1882), authorizing the common council to levy taxes for the several purposes mentioned "but not exceeding the authorized percentage," the percentage limit only applies to such items as are mentioned in sec. 2, subch. V.

11. A city received and retained a sewer system costing nearly $20,000, and had paid no part of the cost. It was absolutely valueless to the contractor, and unless the amount earned under the contract exceeded the constitutional debt limit, the city was bound to pay therefor. The contract was in a sense entire, but it divided the sewers into several districts. The contractor was to build the sewer at so much per foot, depending on the size of material used in the different streets, and he was to put in manholes and catchbasins at agreed prices; and the lumber used was to be paid for at

Herman vs. The City of Oconto.

a certain rate per thousand feet. It was impossible to tell from the written contract itself how much the actual contract price was. The plans, from which a division of the contract could be made, were made a part of the contract, but were not brought up with the record. *Held*, that the transaction was of such a nature that the contract might be severed and held valid up to the limit within which the city was authorized, under the constitution, to contract, and that, defendant having failed to furnish the proper data on which to apportion the invalid part, it should be scaled down to the limit within which the city had the power to contract, and held valid within that limit.

APPEAL from a judgment of the circuit court for Sheboygan county: MICHAEL KIRWAN, Circuit Judge. *Modified and affirmed.*

The facts in this case are quite fully stated on the former appeal (100 Wis. 391), where it was held that the complaint stated a good cause of action, and that the answer was sufficiently definite to permit the introduction of evidence in relation to the issue of fraud, bribery, and corruption therein presented. A second trial was had. By stipulation the complaint was amended to the effect that, after the contract in suit was made, the plaintiff agreed with Turner to make advances for carrying on the work; that, after the work had been partially done, Turner's interest was sold to plaintiff, and notice given defendant; that plaintiff was induced to make advances and to complete the work on the faith that the contract had been fairly let; and that he had no knowledge of any claim that it had been obtained by any improper means. The answer was also amended, setting up a contract between the city and the Oconto Water Company for a water supply, continuing for thirty years from July 9, 1890, at an annual rental of $6,500 for one hundred hydrants, and $50 a year for additional hydrants. It also alleged that on January 1, 1894, the city borrowed from the state $35,000, payable, with interest, in twenty years, at the rate of $1,750, and at the time the contract was made, Octo-

ber 22, 1894, there was interest accrued thereon, and payable January 1st thereafter, amounting to $1,750. It also alleged other indebtedness of the city as follows:

| | |
|---|---:|
| Electric light company | $4,014 50 |
| City-hall and engine-house bonds | 3,000 00 |
| Current expense and city orders | 10,000 00 |
| Other state, county, etc., indebtedness | 5,000 00 |

—making the total indebtedness of the city over $65,000, which was in excess of the five per cent. limit. The place of trial was changed to Sheboygan county. At the trial a further amendment was made to the answer, to the effect that at the time the said contract was made no tax levy was made to discharge the indebtedness thereby created, as required by sec. 3, art. XI, of the constitution; that the city was without funds; and that the city had no power under its charter to incur such indebtedness. It was agreed that the only issue that should be submitted to the jury was the one that arose upon the allegations of the answer relative to Turner's securing the contract by improper means,— the other issues to be determined by the court. Pursuant to this arrangement, the jury rendered the following special verdict:

"*Q.* 1. At or about the time when the sewer contract in suit in this action was entered into by the city of *Oconto* with William Turner, did the said Turner and one Paul J. Foley, or either of them, pay or cause to be paid any money to any member or members of the board of public works of said city for the purpose and with the intent thereby to bribe such member or members, and to corruptly influence their official action in letting or awarding, or in reporting to the city council in favor of the letting or awarding, of such contract to said Turner? *A.* No."

The court rendered a lengthy written decision, and made findings showing the city's assets and liabilities at the date of the contract as follows:

| | |
|---|---:|
| "School loan from state | $35,000 00 |
| City-hall and engine-house bonds and interest | 3,030 00 |
| City orders outstanding | 4,009 00 |

Herman vs. The City of Oconto.

| | | |
|---|---|---|
| Officers' salaries, for fire department, support of poor, etc... | | 609 32 |
| Electric light............................................... | | 628 35 |
| E. L. Shaw, $75 and $133.33................................ | | 208 33 |
| Sewer contract sued on.................................... | | 17,323 01 |
| | | |
| Total.......  ...................................... | | $60,808 01 |
| From which should be deducted: | | |
| County order on hand........................... | $667 00 | |
| Cash in contingent fund........................ | 94 | |
| | | |
| | | 667 94 |
| | | |
| Balance of indebtedness........  .......................... | | $60,140 07 |

Constitutional debt limit, $60,687.75."

As regards the first item mentioned, the court found that said sum was borrowed from the state on April 6, 1894, and that it was payable in twenty annual instalments, of $1,750, with five per cent. interest in addition, on January 1st of each year; that the city received said sum on May 31, 1894, less the advance interest up to January 1, 1895, and that it was borrowed for the purpose of building a high-school building; that on October 31, 1894, there was yet in the high-school building fund $21,433.34; and that the building was then in the course of erection. No proof was offered and no finding made as to any contract relative to the erection of the high-school building, or of its probable cost.

As regards the city-hall and engine-house bonds, the court found there were outstanding bonds amounting to $3,000, of which $2,000 became due, with six per cent. interest, August 18, 1895, and $1,000 and interest August 1, 1896. The interest had been paid to August 1, 1894. In his computation of indebtedness, the court included interest earned, but not due, on the bonds, to the date of the contract, amounting to $30.

The evidence showed total outstanding city orders, $4,100. The court disallowed orders amounting to $91, as being void, having been issued for an unauthorized purpose.

The court found that in August, 1893, the city made a contract with the electric-light company to light the city for three years at a stated price per light, payable at the end of each month. The sum above mentioned is the amount of the bills for lighting for October and November, 1894.

As regards the Shaw indebtedness, it appears that the city owed him $75 for services. Early in October the city entered into a contract with him to superintend the construction of the sewer to be built, and was to pay him for the time so engaged at the rate of $1,600 per year, at the end of each month. He began work November 1st, and the $133.33 above mentioned is for his services for November.

Under the contract in suit, the total amount of the work, at the price agreed upon, was $18,099.66. At the close of the work the next year there had been some delay, and under the terms of the contract the city made a deduction at the time of settlement of $776.65 as liquidated damages. The court found the amount of the indebtedness created by the contract of October 22d to be the difference between these two sums.

At the time the contract was entered into, the city was under contract, by ordinance, with the Oconto Water Company, for a water supply, running thirty years from July 9, 1890, at an annual hydrant rental of $6,900, payable January 1st and July 1st of each year. All instalments had been paid up to July 1, 1894. The ordinance provided that payments should be met by a direct annual tax. The court found that the city was not then indebted under said contract.

It further appears in the case that the city was under contract with divers teachers of its public schools for a period of ten months, beginning September 1, 1894, the monthly pay roll therefor being $920. All wages had been paid up to the time the sewer contract was entered into, and there was over $1,600 yet left in the school fund. The court found no indebtedness under this contract.

The value of the taxable property of the city, upon which

the computation of the limit of indebtedness must be based, was found to be $1,213,755. At the time the sewer contract was entered into, no provision for the collection of a direct annual tax to pay the liability thereby created was made.

Upon the findings so made, the court directed judgment for plaintiff. Both parties filed numerous exceptions. A motion by defendant for judgment, and, if denied, for a new trial, was denied, and from the judgment entered on the verdict and findings the defendant has taken this appeal.

For the appellant there were briefs signed by *P. H. Martin*, of counsel, and oral argument by *P. H. Lynch* and *D. G. Classon*.

For the respondent there was a brief by *Hoyt & Olwell*, attorneys, and *H. O. Fairchild*, of counsel, and oral argument by *F. M. Hoyt*.

BARDEEN, J. We desire to enter our earnest protest against the printed case in this action. It is inexcusably long. It is padded with matter entirely foreign and unnecessary to an understanding of the questions presented for decision. The judge's charge, findings, and exceptions are printed twice. Nearly thirty pages of exhibits to the complaint are printed in full; numerous bonds, orders, stipulations, and proceedings on the former trial are set out at length, and yet no question is raised as to any of them. Five pages are taken up with the cost bill and affidavit of attendance of witnesses, neither of which is questioned. In fact, the printed case seems to be a copy of the record, duplicated in some particulars. It was entirely unnecessary, and constitutes a flagrant violation of Rule VIII. We acquit the learned counsel who argued this case for appellant of any part in its preparation, and trust that the guilty one will never repeat his offense.

Many troublesome and interesting questions have been

presented and ably argued.   We have given them our fullest consideration, and the result has been reached only after careful study and investigation.   The conclusion reached renders it unnecessary to consider several of the most interesting questions raised.

The defendant's first contention is based upon the claim that the contract sued upon is void, as having been secured through bribery and corruption of some of the public officers charged with the duty of letting the contract.   Let us first ascertain the issue presented by the answer on this question. . It charges "that the contract was secured  . . by means of fraud, bribery, and corruption, in payment to certain of the members of the board of public works, . . . whose names are to defendant unknown, large sums of money, intended to corrupt and influence, . . . and which did corrupt, influence, and control, the acts and conduct of the said members in letting and executing said contract." Upon the issue thus presented, the court submitted to the jury the question set forth in the statement.   No one can doubt but that the finding is as broad as the allegation.   It was adverse to the defendant.   This does not satisfy defendant's counsel.   They insist that the issue should have been broadened to meet certain phases of defendant's evidence, which it is claimed warrants it.   In the first place, it should be kept in mind that the controversy here is not between the original parties to the contract.   The plaintiff came in as surety, took up the contract, and expended large sums for its completion.   No proof is offered as to when the alleged bribery was discovered by the city.   The city has received and retained its system of sewers, which cost considerably more than the contract price.   The good faith of the plaintiff in the matter is not challenged, so that there is no superior equity in favor of the city on the face of the situation.   The circumstances are not such as to show that defendant was entitled to any great latitude under its plead-

ing, especially since its paucity of allegation was criticised on the former appeal. Under its charter, the defendant was to let the contract to the lowest reasonable, responsible bidder. The two lowest bids, differing but slightly in amount, were put in by Forrestal and Turner, the former's being the lowest. Before attempting to award the contract, the board had an investigation of the standing of the two bidders made by the city engineer. He reported that Forrestal was not a desirable person to contract with, and that Turner was considered an honest man and a good workman. It is nowhere suggested that the engineer was influenced or corrupted by the illicit funds in circulation. Acting upon this information, the board rejected the Forrestal bid. Turner was left the lowest bidder, and he was reported worthy. He was awarded the contract. The complaint is that a certain lawyer retained in his interest used improper means to secure such award,— not that he paid out any money, as alleged, to influence official actions, but that he bought some of the members refreshments and was distinctly active in securing such award. The testimony offered does not sustain the charge in the answer, and the circumstances are not so flagrant that we can say the court ought to have gone beyond the direct issue made by the pleading. The record shows that this branch of the case was fairly presented, the verdict is within the allegations of the answer, and we perceive no reason for disturbing the jury's finding.

An important question, under the allegations and proof, was whether the alleged contract increased the city's indebtedness beyond the constitutional limit of five per cent. The court found that it did not, and this finding has been attacked with great vigor. To cover all of the questions raised would prolong this opinion to interminable length. We shall notice only those of chiefest importance, and which are deemed decisive of the case.

First as to the question of fact: The city's limit of indebt-

edness was $60,687.75.  The main item of the city's indebtedness was a loan from the state of $35,000, obtained for the erection of a high-school building.  The money was received by the city in May, 1894; and at the time the sewer contract was made, the court finds the city had $21,433.34 of this fund still in its treasury, and that the building was in course of erection.  No proof was offered that any contract had been let for the building of the school house, or as to its probable cost.  The plaintiff insists that, in absence of such proof, the court must consider the sum on hand an asset, and deduct it from the city's indebtedness.  It would have been more satisfactory if some definite proof as to the cost of the school building, or of the contract in relation thereto, had been produced.  But the money was borrowed for a specific purpose.  Under the law, it could not be used for any other purpose without the consent of the commissioners.  The building was in the course of erection when the contract in suit was made.  Under these circumstances, the inference is warranted that the city continued the building to completion.  Municipalities are not given to borrowing more money than they need.  The money having been borrowed for a specific purpose, the presumption is that it was needed and used for that purpose; and we cannot assume there will be a surplus, in absence of proof, or that it has been diverted to other uses.

The argument of plaintiff that the annual apportionment of taxes made by the secretary of state under sec. 1070, Stats. 1898, to pay the instalment due the state January 1st following, made the taxes so levied "in process of immediate collection," so as to make them assets, cannot be sustained. It was not a levy upon the property of the municipality. It was not until December 4th that the various levies were in such form as that they could be collected and enforced from the property liable thereto.  At that time the proper tax roll was put in the collector's hands, and the tax was

Herman vs. The City of Oconto.

then enforceable, regardless of the will of the taxpayer. Not until that time arrived could the amounts so levied be considered assets. *Rice v. Milwaukee*, 100 Wis. 516–521.

The contract in suit was not for a definite sum. It bound the contractor to build sewers on certain streets, according to the plans, at certain prices per foot, for different sized pipes, and at varying prices for other materials, manholes, etc. The contractor was also to do extra work as directed by the engineer, on the basis of fifteen per cent. advance of actual cost. The city reserved the right to vary, diminish, or extend the work. On July 24, 1895, the plaintiff and the city officers got together and made a settlement. They found that there was due for the work done $18,099.66. From this sum the city deducted $776.65, as damages sustained by the city for failure to complete the contract within the time limited thereby, leaving a balance due plaintiff of $17,323.01. The trial court held that this difference was the amount the city agreed to pay under the contract, and was the amount that should be taken into consideration in ascertaining the city's indebtedness at the date of the contract. With this conclusion we cannot agree. The damages allowed were not in contemplation when the contract was made. It is true, the parties stipulated that damages should be paid in case of delay, but that sum was wholly unascertained and unascertainable at that time. It might be nothing, or it might have greatly exceeded the sum subsequently agreed upon. The real question is: What sum did the city bind itself to pay in case the contract was carried out and the sewers were built? No data are furnished by the contract itself from which the exact amount could be computed. That being so, we are bound to assume that the actual amount of the city's debt on the contract was the amount settled upon as having been earned by the contractor or his assignee, and not the difference between that amount and the damages allowed the city. *Culbertson v.*

*Fulton*, 127 Ill. 30–36.   Upon this basis, it will be observed
that the city's total indebtedness at the date of the contract,
inclusive of the sum earned thereon, and less available as-
sets, was $60,916.72, or $228.97 more than the constitutional
limit.   Stating the situation in another way, the city might
contract for the construction of sewers to an amount not
exceeding $17,870.69 without exceeding the limit.   Its con-
tract exceeded that sum by the amount stated, and, unless
the situation is such that it may be scaled down within the
limit, the contract was void.   That question will be dis-
cussed further along in this opinion.

Another important question in this connection is raised
by defendant.   It appears that in 1890 the city contracted
by ordinance with the Oconto Water Company for a water
supply for a period of thirty years, and that the annual rental
at the date of the sewer contract was $6,900, payable on the
1st days of January and July of each year.   Also in August,
1893, it made a contract for three years with the electric-
light company for city lighting at certain prices per light,
payable at the end of each month.   Nothing was due upon
either contract at the time the sewer contract was made.
As to the first contract, the court held there was no indebted-
ness under it.   Under the second contract, the court allowed
the October and November light bills as debts on October
22, 1894, on the ground that there was no money in the
treasury at the time they became due.   The defendant chal-
lenges the court's conclusions, and claims that the indebted-
ness for hydrant rental and electric light for the entire period
the contracts were to run should be considered, in comput-
ing the city's indebtedness.   It is also claimed that the wages
of teachers for the entire period covered by their contracts
should be considered in like manner.   The question seems
to be deemed an open one in this state, notwithstanding
*Stedman v. Berlin*, 97 Wis. 505, and many pages of the brief
are taken up with a discussion of the principle and the au-

thorities. We deem the *Stedman Case* decisive against defendant. The point was directly involved, and was disposed of by the following language, in answering a claim similar to the one here made:

" It is entirely well settled that this claim is unfounded in law. Where a municipality contracts for annual services for a series of years, to be paid for by annual payments, such contract does not come within such prohibition. In such case the whole amount which may ultimately become due does not constitute a debt, within the meaning of the constitution. To that end, regard is to be had only to the amount that may become due within a certain year or other period. 1 Dillon, Mun. Corp. § 136*a*, and cases cited."

This is substantially the holding of the courts in a number of states with a constitutional or statutory limitation similar to our own, as may be noted in the following cases: *Valparaiso v. Gardner*, 97 Ind. 1; *Laporte v. Gamewell F. A. T. Co.* 146 Ind. 466; *Grant v. Davenport*, 36 Iowa, 396; *Creston W. Co. v. Creston*, 101 Iowa, 687; *Walla Walla v. Walla Walla W. Co.* 172 U. S. 1; *Smith v. Dedham*, 144 Mass. 177; *Ludington W. S. Co. v. Ludington*, 119 Mich. 480; *East St. Louis v. East St. Louis G. L. & C. Co.* 98 Ill. 415; *McBean v. Fresno*, 112 Cal. 159; *Saleno v. Neosho*, 127 Mo. 627. It is true there are a number of cases in other states in conflict with this view; but, however debatable the ground, we see no good reason for receding from the position taken in the *Stedman Case*, and hereby affirm and declare that to be the law of this state.

Another claim made is that, in ascertaining the city's indebtedness, interest should be computed on the state loan and outstanding bonds for the entire period they are to run, and added to the principal. This is upon the theory that, when interest is expressly reserved in a contract, it becomes a part of the debt. See Perley, Interest, 5; *Redfield v. Ystalyfera I. Co.* 110 U. S. 174. But is it a debt before it is earned? If so, then the most of the cases in the books

relating to the ascertainment of municipal indebtedness have been wrongly decided. In *Crogster v. Bayfield Co.* 99 Wis. 1, the limit was $257,440. The bonds issued amounted to $240,000, running twenty years, at five per cent. interest. A glance at the case of *Rice v. Milwaukee*, 100 Wis. 516, reveals the fact that, if this theory were to be adopted, the city of Milwaukee would have been indebted many hundred thousand dollars beyond the debt limit. Turn to almost any case in the books, and on this basis the limit had been passed. Such a construction of the law would avoid the greater part of the indebtedness of the municipalities of this state. Interest is not a debt, within the meaning of the constitution, until it is earned and becomes due. When the money was borrowed the city became indebted for the principal sum stated, and agreed to become indebted each year in the future to a sum equal to the interest thereon. Any other construction would lead to most startling results. Many business men and corporations could be forced to the wall if the interest they had agreed to pay on loans made was to be considered a present indebtedness. Men who had reported their financial standing to obtain credit could be called to account for not having taken into consideration their interest obligations which were to become due at some time in the future. There would be no end to the complications that might arise, and not the least would be the overturning of municipal obligations already incurred. The only case which in any way supports the theory in question is *Coulson v. Portland*, Deady, 481, which denied the right of the defendant city to issue interest coupons to railway bonds payable half-yearly through a period of twenty years. We decline to follow it. Interest rests upon much the same grounds as contracts for light and water. There may exist an obligation to pay, but, under the constitution, the indebtedness as to interest comes into existence each year as the obligation matures. It cannot be said to be a

Herman vs. The City of Oconto.

present indebtedness, under any reasonable construction of the constitution. See *Dively v. Cedar Falls*, 27 Iowa, 227.

Another question of difficulty and importance arises upon the contention that the contract is void because at the time it was entered into no provision was made by the city for the collection of a direct annual tax to pay it, as required by sec. 3, art. XI, of the constitution. The original charter of the city gave the council power to build sewers and pay the expense out of the general fund. The city attempted to adopt some of the provisions of the general charter law which would enable it to charge a portion of the expense to adjacent lot owners. The contract in suit was entered into upon the supposition that such authority existed, and provided that, at the city's option, payment might be made in city orders, special assessment certificates, or improvement bonds. The work was to be completed before February 25, 1895, and the last payment was to be made at the expiration of six months from the final estimate. Upon the former appeal it was determined that the attempt to adopt the general charter provisions had failed. On the one side, it is insisted that the city was bound to pay as its charter provided,— out of the general fund. On the other, the claim is that it was the duty of the city, before or at the time of the incurring of said indebtedness, to provide for the collection of a tax to pay the same, and, failing so to do, the contract is void. This involves a construction of the constitutional provision before referred to, which is not entirely free from difficulty. It must be observed that section 3 is a restriction on the power of the cities, not a grant of power. It should be reasonably construed, and so as not to lead to absurd results. It should receive a sufficiently liberal construction to carry out its evident purpose, and at the same time be construed with such a reasonable degree of strictness as not to cripple municipalities in the exercise of their usual

functions. No stretch of construction should be indulged in, to reach cases not reasonably within its terms. It is not a question of inconvenience or hardship, on the one hand, or harsh and technical outreaching, on the other. We are powerless to add to or alter its provisions, and ought not to attempt to evade its clear and imperative commands. The effort must always be to construe it in view of the mischief aimed at, and in such a reasonable way as to prevent unnecessary hardships or absurd or irrational results. So much of said provision as is important in this litigation is as follows:

"No . . . city . . . shall be allowed to become indebted in any manner or for any purpose to any amount, including existing indebtedness, in the aggregate exceeding five per centum on the value of the taxable property therein. . . . Any . . . city . . . incurring any indebtedness as aforesaid shall, before or at the time of doing so, provide for the collection of a direct annual tax sufficient to pay the interest on such debt as it falls due, and also to pay and discharge the principal thereof within twenty years from the time of contracting the same."

These provisions were added to the original section by amendment in 1874. The mischief to be prevented was the creation of excessive debts for local improvements, public works, or the loaning of municipal credit, so payable that the burden should not fall upon those who contracted the obligations, or on their revenues, but on posterity. To do this effectually, it was found necessary to fix a limit on all indebtedness. This was to check the prodigality of municipal officers. The further to prevent them casting the burden upon posterity, they were required to pay the interest annually, and the principal within twenty years, and to make timely provision for the imposition of an annual tax for that purpose. There can be no doubt but that the provision is imperative and mandatory as to a debt coming clearly within its purview. We need not consider whether

a failure to do so would render the debt void, or whether it was a mere provision for the protection of the creditor, and might be waived by him, as contended by plaintiff's counsel and held by the trial court. We will consider only whether it was ever intended to be applicable to such a contract as the one in suit. It bore no interest. It was payable within a year. It possessed none of the mischievous attributes against which the amendment was directed. Waiving for the time being the question of charter limitations, it stood upon no different ground than any debt tne city might create for a municipal purpose, without money in the treasury. It is conceded that the city had no funds on hand with which to pay the contract price. In such case, according to the defendant's contention, the city is powerless to incur any debt. It cannot even purchase a bottle of ink or a postage stamp unless it provides for its payment by voting a tax. It is said that the words "incurring any indebtedness as aforesaid" refer, by necessary relation, to any indebtedness "for any purpose to any amount," mentioned in the preceding sentence, and thus prevent the incurring any debt of any kind without raising a tax to meet it. The argument is plausible, but it leaves out of sight not only the mischief sought to be prevented,— the burdening of posterity by a debt,— but also fails to give any significance to the idea embodied in the latter clause that the tax is to pay interest and the principal within twenty years. These words are significant, and serve to identify and give essence and character to the indebtedness. had in mind by the framers of the amendment. They indicate with certainty that the indebtedness against which a tax must be levied is one bearing interest, the time of payment of which has been extended over a series of years, and more than one year. A contrary view would lead to the palpable absurdity of requiring the city, if temporarily out of funds, to levy a tax for every item of debt it created, whether payable out of current revenues or

not. Such a construction is not necessary to carry out the purpose of the provision, and we cannot assent to its adoption.

Our conclusion is that debts for the ordinary running expenses of a city, and debts within the power of the city to contract, payable within a year out of the incoming revenues, actually levied or in good faith intended to be levied, are not such as are comprehended within the last clause of the constitutional provision quoted. If, however, the debt is made to mature at such a time as would make it a charge upon the future resources of the city beyond the period stated, then the levy of the tax is necessary to its validity.

Finally, the defendant claims the contract is void because the city had no power under its charter to levy a tax to pay for the sewer. This is based upon sec. 2, subch. V, ch. 56, Laws 1882, which provides:

" The common council of said city shall annually levy upon the taxable property of the city to defray the current expenses of said city, a tax not exceeding one half of one per cent., and for all other purposes, except for schools, bridges and the payment of principal and interest of any outstanding debts or obligations of said city a tax not exceeding one half of one per cent. upon all the taxable property of said city."

The view we have taken of the question renders it unnecessary to discuss or decide whether the limitation on the power to raise taxes is such a limitation on the power to contract, as would render a contract void that was in excess of the limit to raise taxes for any one year. See *Howard v. Oshkosh*, 33 Wis. 312; *Stedman v. Berlin*, 97 Wis. 505, 510, 511.

It cannot be said with any show of right that the building of a sewer system is a current expense. While it is not easy to accurately define what may be included under that head, still it is plain that it must be limited to such as are necessary to carry on the city government,— such as are usual and ordinary from year to year. The second limitation excepts

outstanding debts and obligations.   The sewer contract was within the power of the city to make, and to pay out of the general fund.   It was an outstanding obligation, and came within the exception stated.   Sec. 17 of subch. VI of the charter, which says that the council shall levy taxes for the several purposes mentioned, "but not exceeding the authorized percentage, particulary specifying the purposes for which the same are levied," only makes the percentage limit apply to such items as are mentioned in sec. 2.   Any other construction would make the two provisions repugnant to each other, and lead to manifest absurdity.

We now come to the question of whether the contract is such a one as may be scaled down within the constitutional limit.   The cases upon this subject are not entirely harmonious.   The rule is that stated in 15 Am. & Eng. Ency. of Law, 1136: "Generally only that part of the indebtedness incurred which exceeds the constitutional limit will be held void."

In *McPherson v. Foster*, 43 Iowa, 48, the defendants contracted to build a school house, and to receive bonds of the district to the amount of $15,000.   By reason of prior existing indebtedness, the district could only contract an indebtedness amounting to $2,057.50.   The bonds all bore the same date, and were issued, though at different times, as a part of one transaction.   The court held that each bond was void to a sum proportional to the excess, and valid as to the remainder.

In *Stockdale v. School Dist. No. 2*, 47 Mich. 226, Judge Cooley wrote the opinion sustaining bonds issued by the district up to the limit, following the *McPherson Case*.

*Culbertson v. Fulton*, 127 Ill. 30, was a case in which the defendant contracted for waterworks.   The contract exceeded the limit a little more than $1,100.   It was held that the contract to the extent of such excess was void, and valid as to the remainder.   The same court quotes from the *Mc-*

*Pherson Case,* in *City of Chicago v. McDonald,* 176 Ill. 404–414, and concludes that the view of the law taken by the Iowa court was " the correct one, and certainly reasonable and just."

The supreme court of Indiana discusses a similar question in *School Town of Winamac v. Hess,* 151 Ind. 229, and arrives at the same conclusion. In *Catron v. La Fayette Co.* 106 Mo. 659, the court said that when bonds were issued at different times, under an act limiting the total amount to be issued, the fact that bonds were afterwards issued beyond the limit did not invalidate such bonds as were issued before the limit was exceeded.

In *Francis v. Howard Co.* 50 Fed. Rep. 44, the defendant had authority to issue its bonds to the amount of about $15,000. It issued bonds aggregating $35,000, and delivered them at one time. The court held that bonds to the extent of its power to issue became a valid indebtedness against the county. Bonds in excess of the limit were invalid and uncollectible. The rule adopted in the Iowa case was applied, and each bond was scaled down proportionally. The supreme court of Texas adopted the same rule, saying:

" If all of the bonds under the first ordinance were delivered at the same time, so that none of them have priority over the others, the amount of valid debt should be distributed equally between said bonds." *Citizens' Bank v. Terrell,* 78 Tex. 450.

Another case often cited is *Daviess Co. v. Dickinson,* 117 U. S. 657. Bonds to aid a railroad company to the amount of $250,000 were authorized, payable in blocks, in five, ten, fifteen, and twenty years. Bonds were issued in each class in excess of the right to issue, and delivered at different times. Each class had distinct letters, and were numbered in series. The overissue was declared void, and, in determining which were valid and which invalid, the court said that the test was, " Which were first delivered ? " The bonds first delivered, up to the amount authorized, without regard

to classification, were valid. Those in excess of such authority were void.

In *Hedges v. Dixon Co.* 150 U. S. 182, the question involved was whether parties holding a greater part of a series of bonds issued in excess of the limit fixed by a state constitution could proceed in equity to ascertain the amount of such excess, and have each bond scaled down to the limit thus ascertained. Stress was laid on the fact that the bonds in question were issued as a donation to a railroad company, and, the holders not having paid any consideration to the county, no equity was raised against it for the amount represented by the bonds, or any part thereof. The court said:

"What the county authorized and carried into execution in the present case, both by the vote and by the donation, was one entire transaction; and, if it should be so reformed as to curtail the entire issue of bonds to such an amount as was within the constitutional limits of the county to donate, it would be something different from that which was voted by the county, and carried into effect by the issue of the bonds. This would involve the making of a different donation from that which the county voted and intended to make to the railroad company."

A further proposition decided was that the contract as to the bonds being void at law, for want of power to make it, a court of equity had no jurisdiction to enforce such contract, or to so modify as to make it legal, and then enforce it, in absence of fraud, accident, or mistake.

In *Lake Co. Comm'rs v. Standley*, 24 Colo. 1, the principle stated in the foregoing case was recognized, and held not applicable to funding bonds issued in exchange for valid county warrants, although the entire series of bonds was in excess of the constitutional limit.

The only case in this court where this question has been considered is *Crogster v. Bayfield Co.* 99 Wis. 1. The action was by a taxpayer to set aside an issue of bonds by the county in aid of a railroad amounting to $240,000. The

proposition submitted to and accepted by the county was
for the construction of the road in six distinct sections, and
the bonds were apportioned to and delivered as each section
was completed. The entire issue of bonds exceeded the
constitutional limit by something over $15,000. The bonds
to be issued for the completion of the last section of the road
amounted to $25,000. On the ground that the proposition
was, in a degree, severable and apportionable, this court
held that the issue of bonds upon the completion of the first
five sections of the road was valid, and for the last section
invalid. It will be observed that a number of the cases
referred to hold the bonds or contract attacked valid up to
the limit to which the municipality might legally go, with-
out reference to the question whether the transaction was
divisible or not. The others proceeded upon the principle
that, where the transaction or contract is divisible or sepa-
rable, it is valid up to the limit; otherwise, not.

The plaintiff urgently insists that the contract in suit is
of such a nature that the court may properly hold it valid
to the extent to which the city was at liberty to contract.
So far as considerations of equity are concerned, the city
has not a foot to stand upon. It has received and retains a
sewer system costing nearly $20,000. It has paid no part
of the cost. It would be absolutely valueless to the con-
tractor. Except that the amount earned on the contract
exceeded the debt limit, it was bound absolutely to pay for
what it received. The city had authority to contract for
the sewer, within a few dollars of the price stipulated. It
has received all the benefits of the contract, and should pay
the price, unless some legal stumbling block is in the way.
We have already adverted to the terms of the contract. In
a sense, the transaction was entire. There was an engage-
ment on the one side to perform, and on the other to pay.
In this view, the engagement in the *Crogster Case* was en-
tire. But here the contractor agrees to build a certain num-

ber of feet of sewer of a given size of pipe on one street, a certain number on another, and more on other streets, of varying sizes. He is to receive a stipulated price per foot for each size of pipe on the different streets set out in detail in the contract. He is to put in manholes and catchbasins at agreed prices. He is to use lumber and be paid at a certain rate per thousand feet. His work is under the control of the board of public works, who have power to vary, diminish, or alter the work. It is impossible to tell from the written contract itself how much the actual contract price would amount to. It is only by computing the length of streets in connection with the plans that an approximate idea of the total cost can be arrived at. The plans were made a part of the contract, but they do not seem to have been brought into the record. The contract divides the sewer into several districts, the last one mentioned covering but three streets. Under these circumstances, we are of the opinion that the transaction is of such a nature as that it may be severed and held valid up to the limit to which the city was authorized to contract. Its divisibility depends upon the separable character of the work to be done. If the plans had been brought into the record, so that we could have some data to work upon, we might say the work done in the last district mentioned in the contract was outside of the limit. The failure to give us the proper information leaves us but one course to pursue: The recovery will be scaled down to the limit the city had power to contract for, and held valid within that limit. The excess is invalid.

*By the Court.*— The judgment appealed from is modified by deducting therefrom the sum of $228.97, and, so modified, is affirmed. No costs will be allowed to either party, except that respondent shall pay the clerk's fees.